ORIGINAL
D+F
C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------
UNITED STATES OF AMERICA

-against-

WILLIAM J. AVILEZ,

Defendant.
-------------------------------------------------

**MEMORANDUM & ORDER**
Case No. 02-CR-999 (FB)

*Appearances:*
*For the Government:*
ROSLYNN R. MAUSKOPF
United States Attorney for the
Eastern District of New York
by:  MAX MINZNER, ESQ.
     Assistant United States Attorney
One Pierrepont Plaza
Brooklyn, NY 11201

*For the Defendant:*
PETER TILL, ESQ.
105 Morris Ave., Suite 201
Springfield, NJ 07081

**BLOCK, District Judge:**

On March 3, 2003, William J. Avilez ("Avilez") pleaded guilty to conspiracy to possess with intent to distribute cocaine. Based on an adjusted base offense level of 23 and a Criminal History Category I, his sentencing guidelines range was 46 to 57 months' imprisonment. At sentencing, he sought a downward departure for aberrant behavior and diminished capacity. On December 9, 2003, the Court, departing from the guidelines range, sentenced Avilez to a three-year term of probation with special conditions of one year of community confinement and participation in a mental-health-treatment program under the direction of the Probation Department.

1

The Government appealed, arguing that there was no basis for departure. On December 3, 2004, prior to the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), the circuit court remanded since there was an apparent discrepancy as to the basis for the departure between the sentence rendered in court and the Statement of Reasons which accompanied the written judgment. Specifically, the circuit court noted that "[d]uring the sentencing proceeding, the [district] court appeared to depart solely on the basis of diminished capacity[,]" but since the written Statement of Reasons stated that the departure was predicated upon both diminished capacity *and* aberrant behavior, it directed the district court on remand "to clarify the basis for the departure" in an amended written judgment. *See United States v. Avilez*, 116 Fed. Appx. 323, 324, 2004 WL 2757123 (2d Cir. Dec. 3, 2004). The circuit court did not pass upon the merits of the Government's appeal, noting that after the district court amended the judgment, either party may restore jurisdiction before the same panel of the circuit court by the simple expedient of "filing with the Clerk of [the Circuit] Court a copy of the amended judgment and a letter advising the Clerk that jurisdiction should be restored." *Id.*

I

The Court's Statement of Reasons inadvertently was in error. Indeed, the basis for departure, as reflected in the Court's sentencing in open court was solely based upon defendant's diminished capacity pursuant to U.S.S.G. § 5K2.13; moreover, the Court specifically rejected aberrant behavior in its departure calculus. *See* Tr. II at 17 ("I

2

am not talking about the aberrant behavior.").[1]

The Court recognizes, however, that should the Government now wish to restore its appeal, a further remand would be required in light of *Booker* since the case would still be on direct appeal. *See Guzman v. United States*, 404 F.3d 138, 140 (2d Cir. 2005) (holding that *Booker* does not retroactively apply to collateral cases, but that the Supreme Court in *Booker* "expressly made [its] holdings applicable to all cases pending on direct review."). As the Second Circuit recently explained in addressing a pre-*Booker* sentence/post-*Booker* appeal, even though

> [t]he government recognized that while it was unlikely that the district court would have issued a more severe sentence had it possessed, *ab initio*, the greater flexibility afforded by *Booker*, a limited remand would be appropriate to give the district court the opportunity to re-evaluate the sentence with appropriate attention to the provisions of 18 U.S.C. § 3553(a), and to state in open court, and in writing, the reasons why a sentence outside the calculated Guidelines range adheres to those provisions.

*United States v. Godding*, 405 F.3d 125, 126 (2d Cir. 2005).

On such a remand, the Court could rule that its sentence would still fall within section 5K2.13 diminished capacity departure guidelines law, but the Court could also consider whether a non-guidelines sentence could be imposed, even if one were to disagree with the appropriateness of a diminished capacity departure, after considering all the factors listed in 18 U.S.C. § 3553(a). However, the Court would have

---

[1] "Tr. II" refers to the transcript of the adjourned sentencing proceeding of December 2, 2003.

to afford both parties the opportunity to bring forth post-*Booker* considerations and the sentence would be imposed "after presentation by the Government of aggravating circumstances or by the defendant of mitigating circumstances that existed at the time but were not available for consideration under the mandatory Guidelines regime." *United States v. Crosby*, 397 F.3d 103, 118 (2d Cir. 2005).

In the Court's view, the prospect of a further remand should obviously be avoided. Although a district court should not generally exceed the scope of a circuit court's mandate, "a district court may resentence beyond the scope of the mandate, or may resentence a defendant on a limited remand using fresh considerations, if it has 'cogent' or 'compelling' reasons, including 'the need to correct a clear error.'" *United States v. Johnson*, 378 F.3d 230, 243 (2d Cir. 2004) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)). In *Quintieri*, the Second Circuit defined cogent and compelling reasons to include "an intervening change of controlling law." 306 F.3d at 1230. Because *Booker* represents such an intervening change of controlling law, the Court may exceed the Second Circuit's limited mandate and now determine whether resentencing is warranted under *Crosby*.

As *Crosby* instructs, before proceeding with resentencing, "the District Court should obtain the views of counsel, *at least in writing*, but need not require the presence of the Defendant." *Crosby*, 397 F.3d at 120 (emphasis added) (quotations and citations omitted). The Court should thereafter "either place on the record a decision not to resentence, with an appropriate explanation, or vacate the sentence and, with the

4

Defendant present, resentence in conformity with the [Sentencing Reform Act of 1984], *Booker/Fanfan*, and this opinion, including an appropriate explanation." *Id.* (citations omitted). The Court therefore invited the parties to opine as to whether they agreed that the Court could now proceed with resentencing under *Booker*, and, if so, whether they wished to present, in writing, any aggravating circumstances or mitigating circumstances. *See United States v. Avilez*, No. 02-999, slip op. at 2-3 (E.D.N.Y. June 8, 2005). The Government responded by letter dated July 23, 2005, agreeing that the Court should now resentence in accordance with *Booker*, but arguing, without presenting any additional circumstances, that the only reasonable sentence under the new nonmandatory Guidelines regime should still be within the guidelines range of 46 to 56 months. *See* Letter from Max Minzner (June 23, 2005). Avilez responded that "the record was complete." Letter from Peter W. Till (July 8, 2005).

## II

The Government's argument on its appeal under the pre-*Booker* guidelines diminished-capacity departure regime was that the district court "made no specific finding that Avilez's reduced mental capacity affected his ability to appreciate that it was wrong to sell crack, to exercise the power of reason, or to control behavior that he knew to be wrongful." Brief and Appendix for the United States, at 14. The Government noted that the district court's conclusion that there was a causal relationship between the crime and Avilez's diminished capacity appeared to be erroneously based on the statement in Dr. Tuchin's neuropsychological evaluation that

5

Avilez "has very low self-esteem, is prone to mental confusion, and thus, highly susceptible and suggestible to others," and that "[t]here are many issues that have suggested [sic] that he defers to other's [sic] thinking because he doesn't trust his own thinking." *Id.* (quoting Dr. Tuchin's testimony at the December 2, 2003, sentencing proceeding). The Government contended that these observations "did not satisfy the Guidelines criteria that define a 'significantly reduced mental capacity' as lacking "any ability to 'understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason.'" *Id.* at 15 (citing U.S.S.G. § 5K2.13 Commentary, Application Note 1). In support of this contention, the Government pointed to that part of Dr. Tuchin's report that opined that Avilez "was aware of his wrong-doing [sic], and has the ability to admit guilt." *Id.*

Even if one were to agree with the Government's contention that Dr. Tuchin's report and the district court's conclusion did not support a diminished capacity departure under the strictures of the pre-*Booker* guidelines regime, the report, coupled with the doctor's testimony at the sentencing hearing, and the district court's sentencing considerations, surely would have supported a non-guidelines sentence under the post-*Booker* regime. Considering the advisory nature of the guidelines and the section 3553(a) factors, the Court is of the firm opinion that the sentence it imposed would meet the "reasonableness" standard under *Crosby*. *See Crosby*, 397 F.3d at 110. Although the Court has considered all of the section 3553(a) factors, in addition to the advisory guidelines range, as well as the departure criteria under section 5K.2.13 for

6

diminished capacity, it considers the factors listed under subdivisions 1, 2 and 3 of section 3553(a) to be the most relevant.

## A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The defendant pleaded guilty to conspiring to possess with intent to distribute cocaine base in an amount of 50 grams or more in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). This is indeed a serious offense and triggered a base offense level of 30; however, because the defendant was entitled to a two-level reduction under the safety valve provision and received a further two-level downward adjustment for being a minor participant, as well as a three-level adjustment for acceptance of responsibility, the total offense level was 23, resulting in the guidelines range of 46 to 57 months.

Under section 3553(a)(1), the seriousness of the offense must, however, be evaluated in terms of the underlying circumstances of the defendant's involvement. As reflected in the Offense Conduct section of the Pre-Sentence Investigation Report ("PSR"), to which there was no objection, the defendant, who had recently turned 18 at the time of his arrest, was arrested after he retrieved a bag of cocaine from the bedroom of the apartment of the principally culpable co-defendant David LaJara. *See* PSR ¶5. As further detailed in the PSR, "the defendant informed that he was employed by LaJara for approximately one year," during which time he sold crack cocaine from the apartment "at the direction of LaJara." *Id.* ¶8. The defendant's role was simply to retrieve $20 bags of crack cocaine from LaJara's bedroom closet and "g[i]ve the bags to LaJara, who then sold the drugs to customers." *Id.* The defendant would also collect

7

money from customers, but he gave all the money to LaJara." *Id.* For his services, "LaJara gave the defendant $20 whenever he was in need of financial assistance." *Id.* In sum, starting when the defendant was 17 years old, he was, as the Court commented at the time the defendant initially appeared for sentencing, nothing more than "an errand boy" for LaJara, "just hanging out" in LaJara's apartment. Tr. I at 13.[2] Moreover, consistent with his lawyer's characterization of the defendant as being "totally disconnected," no member of the defendant's family appeared at his sentence in spite of his lawyers requests. *Id.* at 9-10.

Particularly troubling to the Court when the defendant first appeared for sentencing was the Court's observation that the defendant "looks at me with a blank face," and "doesn't seem to be well coordinated or emotionally with what [wa]s happening," noting that "[h]e hasn't moved" or "blinked his eyes," and "looks somewhat like a person with the affect of somebody that [has] a reduced mental capacity." *Id.* at 14. Accordingly, the Court inquired of defendant's counsel, who had told the Court that the defendant had only an eighth-grade education,[3] had all the characteristics "of a person who is learning disabled," and had no reading skills, whether he "thought about getting a psychological evaluation." *Id.* at 11. In response, counsel commented that although he was retained by the family, "this has become a pro

---

[2] "Tr. I" refers to the transcript of the initial sentencing proceeding on October 21, 2003.

[3] The PSR confirmed that defendant "did not complete the 9th grade"; moreover, "his academic standing, attendance and behavior were rated as poor." PSR ¶ 35 (internal quotations omitted).

8

bono affair," and that although he suggested to the defendant's family that the defendant be psychologically evaluated, "the funds simply were not available." *Id.* at 11, 15. After advising counsel that if the defendant were indigent, he might consider seeking the Court's aid, the sentencing was adjourned because the Court believed that "the best way would be to have an evaluation before [the defendant] was sentenced[,]" *id.* at 16; the Court admonished defendant's counsel "to do a better job representing your client." *Id.*

Defendant was thereafter able to enlist the services of Dr. Tuchin, an eminently qualified neuropsychologist.[4] She appeared at the adjourned sentencing date, at which time the Court considered her comprehensive report and also took her testimony. Regardless of whether her report and testimony supports the Court's departure for diminished capacity under *pre-Booker* law, it provides invaluable insights and understandings as to the characteristics of the defendant under section 3553(a)(1).

As Dr. Tuchin explained in her report, Avilez's IQ score was 70, which placed his level of intellectual functioning in the borderline mentally defective range, defined as Mildly Mentally Retarded under the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"). *See* Stacey R. Tuchin, Confidential Neuropsychological Evaluation (Oct. 31, 2003) ("Dr. Tuchin Evaluation") at 6. In regard

---

[4] Dr. Tuchin earned a masters of education from Harvard University and a doctorate in clinical psychology from Albert Einstein Collect of Medicine of Yeshiva University, and completed a post doctoral fellowship in neuropsychology at Yale University, School of Medicine. *See* Resume of Stacey R. Tuchin. She is currently the Director of Neuropsychology for Neuropsychological Associates of New Jersey, L.L.C. *See id.*

9

to his social intelligence, Dr. Tuchin discerned that Avilez's common-sense reasoning was "impaired" and that he had "an inability to exercise social judgment." *Id.* at 5. She reported that he had a tendency "to defer to others with little analysis of their intentions[,]" and that "[h]e seem[ed] to lack the coping skills to deal with difficult situations which result[ed] in a tendency to act impulsively." *Id.* She concluded that although the defendant was "aware of his wrong-doing [sic] . . . , his profoundly impaired thought processes, defective problem-solving capacities, and faulty reasoning render[ed] him unable to make effective decisions and appropriate judgments." *Id.* at 6. Dr. Tuchin confirmed what was essentially undisputed -- that the defendant acted virtually entirely at LaJara's direction, and opined that she had "no doubt that there [wa]s a connection" between his mental deficiency and the commission of the crime. Tr. II at 11. "Given the severity of Mr. Avilez's mental disabilities," Dr. Tuchin concluded that the defendant was "in imminent need for comprehensive rehabilitative therapies[,]" rather than incarceration. Dr Tuchin Evaluation at 7.

## B. The Need for the Sentence Imposed (18 U.S.C. § 3553(a)(2))

Given the nature of the defendant's involvement in the crime to which he pleaded, and his mental impairment, the Court still does not believe that incarceration is appropriate. Imprinted impenetrably on the Court's mind is the Court's observations of the defendant's dull, blank, expressionless, disturbed affect during the sentencing, which cannot be fully appreciated by anyone reading the cold record. As recently aptly observed by Circuit Judge Raggi in recognizing the difficulty of assessing a defendant's

credibility by a circuit court, "a cold transcript contains only the dead body of the evidence, without its spirit. It cannot reveal the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration." *Zhang v. United States Immigration & Naturalization Serv.*, 386 F.3d 66, 72 (2d Cir. 2004) (citations and quotations omitted).[5]

Until he was sentenced on December 2, 2003, the defendant was at liberty for approximately one-and-a-half years from the date of his arrest on a $25,000 Personal Recognizance Bond. As reported in the PSR, he "has been compliant with all reporting requirements." PSR ¶30. Under all the circumstances, incarceration is not here needed "to reflect the seriousness of the offense, to promote respect for the law[,]" "to afford adequate deterrence to criminal activity[,]" or "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)-(C). Rather, sentencing in this case should focus on the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

## C. The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))

The Court continues to agree that, as recommended by Dr. Tuchin, community confinement combined with cognitive rehabilitation would be best for Avilez. *See* Dr. Tuchin Evaluation at 6-7. The Bureau of Prisons contracts with

---

[5] It is at times like this when the Court wonders whether it should adopt the practice of its colleague, Judge Weinstein, of videotaping his sentences to aid the circuit court in assessing whether the district court's sentence was reasonable.

11

community confinement centers (CCCs), also known as halfway houses, to "provide a structured, supervised environment and counseling, job placement, and other services. CCCs help inmates gradually rebuild their ties to the community and facilitates supervising offenders' activities during this readjustment phase." Federal Bureau of Prisons, Community Corrections, http://www.bop.gov/locations/cc/index.jsp (last visited July 12, 2005). Requiring Avilez to serve one year of community confinement will more likely provide him with precisely the rehabilitative needs envisioned under section 3553(a)(2)(D) than conventional incarceration.

The Court has visited the halfway house in Brooklyn, where Avilez is likely to be sent, and was impressed with the structure it provided for youngsters, such as Avilez, and, in particular, its success in obtaining employment for them while they are otherwise confined and subject to strict supervision and counseling. Coupled with mental-health treatment to be provided and supervised by the Probation Department, which is also part of the Court's sentence, this type of sentence is clearly in keeping with the kind of sentence contemplated by section 3553(a)(2)(D) for this mentally and emotionally labile, aimless youngster, who was just 17 years old when he served as LaJara's lackey.

## CONCLUSION

The Court adheres to its original sentence. In doing so, it has taken pains to explain why its original sentence would be reasonable under *Booker* and *Crosby* even if it now be viewed as a non-guidelines sentence rather than under the pre-*Booker*

strictures of departure law. Surely, should the Government disagree and choose to rekindle its appeal, the circuit court would not consider a sentence within the guidelines range of 46-57 months, as proposed by the Government, to here be reasonable. Whether it would consider the Court's sentence of one year's confinement in a halfway house, coupled with mental health treatment, to be unreasonable, and require some period of more conventional incarceration, is problematic, but the circuit court, in making its subjective "reasonableness" assessment, will have never seen the emotionally disconnected, blank, expressionless look on the defendant's face when he stood before the Court during sentencing.

_____
FREDERIC BLOCK
United States District Judge

Brooklyn, New York
July 12, 2005